

NUMBER 13-18-00451-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LUIS DE JESUS LARA MUNOZ AND
UNIMEX LOGISTICS, L.L.C.,                                  Appellants,

**v.**

RAY CASTILLO,                                                    Appellee.

**On appeal from the 370th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Hinojosa
Memorandum Opinion by Chief Justice Contreras**

In this personal injury case arising out of an auto accident, a jury awarded over $2.8 million in actual damages to appellee Ray Castillo in his suit against appellants Luis de Jesus Lara Munoz (Lara) and Unimex Logistics, L.L.C. (Unimex). In ten issues on appeal, appellants contend: (1) the jury charge should have included a question about

Castillo's negligence; (2) a mistrial should have been granted because evidence about insurance came before the jury; (3–4) certain testimony from Castillo's damages experts should have been excluded; (5) the jury charge should have included an instruction regarding mitigation of damages; (6–9) the evidence was insufficient to support the damages awards; and (10) the damages awards were excessive.

Because there was factually insufficient evidence to support the award of certain future medical expenses, we affirm in part, reverse in part, and remand for a new trial, subject to remittitur.

## I. BACKGROUND

The accident at issue occurred on December 17, 2015, on the Interstate 2/U.S. Route 83 eastbound frontage road in Mission, Texas. Castillo, a City of Mission employee, was driving in his city-owned Ford Ranger pickup truck; Lara was driving in a tractor-trailer owned by Fassen Transport and leased by his employer, Unimex. Castillo alleged in his live petition that Lara and Unimex were negligent and grossly negligent, and that he suffered "severe physical and emotional injuries" as a result of the accident.

### A. The Accident

Jose Cavazos, a traffic investigator with the Mission Police Department, testified at trial that Lara's tractor-trailer generated tire marks which "came to about the center of the inside lane" (Lane 1) of the three-lane frontage road. When the tractor-trailer came to rest after the accident, it was blocking the outside lane (Lane 3), the center lane (Lane 2), and "probably a few inches" of Lane 1. Cavazos therefore determined that Lara turned right from Lane 1, which is a violation of state law.[1] *See* TEX. TRANSP. CODE ANN.

---

[1] According to photographs and a map of the area which were entered into evidence, the street

2

§ 545.101(a).

Cavazos further stated that it was his responsibility to determine whether Castillo committed any violations leading up to the crash, but he did not find any. He confirmed that, though a witness reported that Castillo was traveling at "about 50 miles per hour," the speed limit was 55 miles per hour. Cavazos determined that, before impact, Castillo was driving in Lane 3.

Cavazos conceded that, although Lara violated the law, he did not cite Lara for a traffic offense. He explained: "I think I just—[w]ith everything that was going on—just missed it." On cross-examination, he agreed that it would not have been necessary for him to issue a citation immediately.

Cavazos explained that, assuming Lara was driving at ten miles per hour when he attempted the right turn, it would have taken him about 1.63 seconds to drive across the 12-foot-wide center and outside lanes. In Cavazos's opinion, Castillo would not have had sufficient time to perceive and react to the movement of the tractor-trailer. He opined that this type of turn is extremely risky and presents a "probability and a potential" for harm. He agreed on cross-examination that a tractor-trailer such as Lara's "can't just turn the way a normal auto turns," but when asked whether it is "common" for an 18-wheeler to use more than just the right lane to make a right turn, Cavazos replied: "That's correct, but illegal."

Cavazos testified that, if a driver has the hazard lights on and then attempts to activate the turn signal, there would be no change in the signal. In that situation, to

upon which Lara was attempting to turn—Nueces Street—extends out from the frontage road at an obtuse angle to the direction of travel. That is, a vehicle attempting to make a right turn onto Nueces Street from the eastbound frontage road would have to turn more than ninety degrees.

3

properly signal a right turn, the driver would have to turn the hazard lights off first so that the turn signal functions properly. On cross-examination, he acknowledged he has never driven or attempted to use a turn signal in an 18-wheeler.

Cavazos identified the "Texas Commercial Motor Vehicle Drivers Handbook" as a book that drivers must study to pass their commercial driver's license (CDL) test. A section entitled "Space for Turns" provides:

Here are some rules to help prevent right-turn crashes:

Turn slowly to give yourself and others more time to avoid problems.

If you are driving a truck or bus that cannot make the right turn without swinging into another lane, turn wide as you complete the turn. Keep the rear of your vehicle close to the curb. This will stop other drivers from passing you on the right.

Don't turn wide to the left as you start the turn. A following driver may think you are turning left and try to pass you on the right. You may crash into the other vehicle as you complete your turn.

If you must cross into the oncoming lane to make a turn, watch out for vehicles coming toward you. Give them room to go by or to stop. However, don't back up for them, because you might hit someone behind you.

Cavazos stated that, although truck drivers are "allowed" to go into oncoming traffic when safe, in order to make a wide right turn, "you are not allowed to go to a lane to your left to make that turn" because "there's traffic behind you that doesn't know what you're doing" or "a vehicle will attempt to pass you on the right."

Castillo testified that the warning light system on top of his vehicle was activated at the time of the crash. He saw the tractor-trailer in front of him, in Lane 2. As Castillo approached at about 45 miles per hour, the tractor-trailer veered to the left, toward Lane 1. The truck then "whipped" in front of him and collided with him. According to Castillo, the impact was "severe" and part of his vehicle ended up underneath the trailer. He said

4

his "whole left side slammed against" the side of his truck, and his head hit the glass. He then realized "there was diesel everywhere" due to the tractor-trailer's ruptured fuel tank. Police pried open the passenger door and helped Castillo exit his vehicle. He was then transported by ambulance to a hospital.

Lara testified that he made the right turn from Lane 1; he said there would have been no way to make the right turn from Lanes 2 or 3. He agreed that making the turn from Lane 1 entails blocking all three lanes, and he agreed that such a maneuver was "extremely dangerous" and reckless. He did not see Castillo's vehicle prior to impact. He agreed that he was fully responsible for the crash, and that Castillo was not responsible.

## B. Regulatory Violations

David Stopper, a former law enforcement officer who conducts forensic analyses of collisions involving heavy commercial vehicles, stated that regulations promulgated by the Federal Motor Carrier Safety Administration (FMCSA) require a driver of a tractor-trailer or any other vehicle weighing over 13 tons to have a CDL, and the driver's motor carrier has a duty to train the drivers. Copies of the applicable regulations were entered into evidence. Stopper explained that the regulations were not complied with in this case because, according to Lara's deposition testimony and October 2015 application for employment with Unimex, Lara had not received "specific training in operating commercial motor vehicles." *See* 49 C.F.R. § 391.11(b)(3) (stating that a person is qualified to drive a commercial motor vehicle only if, among other things, he or she "[c]an, by reason of experience, training, or both, safely operate the type of commercial motor vehicle he/she drives"). Stopper claimed Lara's employment application was incomplete because, though it stated that Lara had experience with "tanker, flat bed, wide load," it

5

did not state the dates or total miles of his experience with those types of vehicles. *See id.* § 391.21 (providing that an application for employment with a motor carrier must include, among other information, "[t]he nature and extent of the applicant's experience in the operation of motor vehicles, including the type of equipment (such as buses, trucks, truck tractors, semitrailers, full trailers, and pole trailers) which he/she has operated").

In Stopper's opinion, Lara was an "entry-level driver" as defined in the regulations, and therefore Unimex was required to provide certain additional training to him. *See id.* § 380.502(b) (stating that an "entry-level driver" is "a driver with less than one year of experience operating a [commercial motor vehicle] with a CDL in interstate commerce")[2]; *id.* § 380.509 (providing that "[e]ach employer must ensure each entry-level driver" receives training on driver qualification requirements, hours of service, driver wellness, and whistleblower protection).

Stopper also opined that the regulations concerning continuous hours of service were violated. At the time of the collision, Lara was delivering a load from Hamilton, Ohio, to Mission. Based on Lara's fuel log, Lara's deposition testimony that his tractor-trailer was limited to 67 miles per hour, and Stopper's own calculations, Stopper figured that Lara must not have taken a ten-hour break after being on duty for fourteen hours, as required by the regulations.[3] On cross-examination, Stopper conceded that his calculations were based on an assumption that Lara departed Hamilton, Ohio at 1:00 p.m.

---

[2] According to Lara's employment application, in the previous ten years, he was employed in only one position involving driving, from December 2014 to October 2015.

[3] A "Driver Safety/Company Policy" form issued by Unimex stated that "[l]ate deliveries will not be tolerated" and "[u]nexcused late deliveries will result in disciplinary action consisting of a monetary fine of $100.00." Yet, according to Stopper, given the time Lara departed Ohio and the time he was supposed to arrive in Mission, Lara could not have made the 1,400-mile journey without violating the hours of service regulations.

on December 15, 2015. That assumption, in turn, was based on a "Load Confirmation" form prepared the day prior to the delivery by MLS Freight Logistics.[4] Stopper agreed that, in theory, a truck driver could traverse 1,400 miles in a two-day period while complying within the hours of service regulations.

Joe Rodriguez, Unimex's operations manager, testified via video-recorded deposition that he was in charge of safety for the company in 2015. Rodriguez agreed that Unimex did not have Lara's entry-level training certificate in its file because Lara did not receive that training. He therefore agreed that, on the day of the accident, Lara was driving "[i]n violation of the entry level certificate" part of the federal regulations. And he agreed that it would be "reckless" for a tractor-trailer operator to turn right from the inside lane of the frontage road onto Nueces Street, as Lara did.

Rodriguez acknowledged that Unimex hired Lara even though Lara had twice been issued speeding tickets in the eighteen months prior to his hiring. He stated that it was Unimex's policy to hire drivers with at least two years' experience, but he agreed that this policy was "not followed" when Lara was hired. Rodriguez further agreed that Unimex had a personnel file containing Lara's original log books and satellite tracking data, but although the file was requested in discovery, it was not provided to Castillo's counsel.

On cross-examination, Rodriguez stated that Unimex hired Lara with the expectation that Lara's father, a trucker with 25 years' experience, would train him. He could not explain why Lara did not watch the training videos that, according to Rodriguez, are required for all Unimex drivers. He admitted that, though Lara was hired to drive "box-

---

[4] The "Load Confirmation" form contained, among other information, the address of the pickup location. Next to the pickup location address, the form stated: "Date: 12/15/2015 0900 12/15/2015 1300." In a field entitled "Instructions," the form stated: "Please pick up load before 1:30PM."

type trucks" with sleeper berths, Lara's employment application did not indicate he had any experience with those types of vehicles, and Unimex did not train him on how to operate those vehicles. Rodriguez also admitted that Unimex had destroyed or disposed of Lara's log books from the date of the accident—he explained that this was because the regulations required retention of log books for six months, and it is the company's practice to "get rid" of the log books after that time because "they take up a lot of space." Rodriguez further explained that, even though the company knew of the accident, it did not retain Lara's log books beyond six months because the accident was not "DOT reportable" for the reason that the driver had not been cited.[5] He conceded that, although it is Unimex policy to administer alcohol and drug tests to its drivers after any accident, regardless of whether the driver receives a citation, Lara was not tested in this case.

Andrew Sievers, a trucking safety consultant, testified as an expert for Unimex. According to Sievers, Lara had a valid and appropriate CDL and met the driver qualification requirements at the time he was hired. However, Unimex failed to give Lara the "entry-level training" required by the regulations. On cross-examination, Sievers stated that, though he has experience driving trucks and other commercial vehicles, he has never had a CDL. He opined that Lara's maneuver "wasn't a great turn" and he agreed that Lara could have avoided making the turn. However, he stated that Stopper's opinion about Lara's hours of service was speculative because "we don't know exactly what time [Lara] left" Ohio, and there is "no evidence of driver fatigue."

Lara testified that he received his CDL in August of 2015. At the time he applied to

---

[5] Rodriguez also stated that Unimex requested Lara's satellite tracking data from the separate company that keeps that data, though he could not recall if that request was in writing. The data was never provided.

8

work for Unimex, he had no experience driving interstate—but he did not tell Unimex this because they never asked. At the time of his application, he also had no experience driving a "box-type" trailer such as the one involved in this accident. He was not paired with another driver and Unimex provided no training. Lara admitted that he signed a form indicating that he had watched sixteen training videos covering various safety topics, but in fact he never received that training. Lara stated that he submitted his original driver logs to Unimex after the accident.

## C.      Damages

Omar Trujillo testified that he is Castillo's friend and fellow youth football coach. Before the accident, Castillo was a "go-to guy" who was "always there" when needed. After the accident, Castillo "doesn't really come out as much" and "can't do as much." Trujillo can tell Castillo is in pain because he is "kind of stiff" and makes "little grimaces." Chris Von Wald, another youth football coach, stated that Castillo "is not the same person he used to be" and is "not as active with the kids."

Rick Gutierrez testified that Castillo is a meter reader for the City of Mission and a co-worker. He stated that, as part of the job, Castillo makes around 250 stops with his pickup truck, reads 400 to 500 meters, and walks four to five miles every day. Most meters are covered with dirt or debris and need to be cleaned before reading. Some metal meter boxes are so heavy that two or three workers are needed to replace it after the meter inside is read. Castillo's responsibilities also include disconnecting water services for delinquent customers and occasionally swapping out damaged meters with new ones. According to Gutierrez, since the crash, Castillo needs help to pick up the equipment, and he takes "like a day, a day and a half more than what he used to."

Ruben Pechero, M.D., testified by video-recorded deposition that he is Castillo's treating physician. Castillo came to him after the accident complaining of pain in his left ankle, left knee, left shoulder, both wrists, collarbone, neck, chest, and lower back. Pechero prescribed naproxen and physical therapy, but Castillo's back problems persisted. An MRI revealed moderate herniation in the disc of the L5-S1 vertebrae, causing compression of a nerve root; and an electromyogram (EMG) showed "electrical evidence for a bilateral S1 radiculopathy," meaning pain radiating to the lower extremities. Pechero ordered an epidural steroid injection, which was given on March 16, 2016. According to Pechero, the injection did not eliminate Castillo's pain, so he recommended surgery on the herniated lumbar disc, which he performed on March 20, 2017.[6]

Pechero stated that, as a result of the surgery, Castillo's pain decreased. However, even with the surgery, Castillo's L5-S1 disc was weak and susceptible to re-injury. According to Pechero, "[a]bout 25 percent" of patients undergoing this type of surgery "will have some type of problem" due to recurring disc herniation and will need additional spinal fusion surgery.

About a month following the surgery, Pechero signed a document stating that Castillo "is able to return to work with the following limitations": he should not lift over ten pounds; should not do any repetitive bending, stooping, or lifting; and should not walk for an extended period of time.[7] His chances for re-injury would be "[m]uch less" if he complied with these limitations. But Pechero conceded that, according to a job description

_____

[6] Pechero stated that Castillo sought a second opinion from Jose G. Dones, a neurosurgeon, and Dones agreed with the recommendation of surgery on the lumbar disc.

[7] The document also stated: "Patient asked to be released to return to work in [f]ear of loosing [sic] his job." According to Pechero, Castillo said he wanted to return to work "even if he has no full rehabilitation."

provided by the City of Mission, Castillo's job required him to do many of these things.

Pechero testified that Castillo later asked him to sign a "release" allowing him to return to work without stating any limitations. According to Pechero, Castillo wanted to return to work because his family would have "serious economical problems" if he did not. Pechero testified that he signed the document "[a]gainst [his] will."[8]

According to Pechero, another MRI also showed that Castillo had a herniated cervical disc and possible radiculopathy in his upper extremities. A separate epidural steroid injection was administered to treat this herniated disc. Again, the injection did not stop the pain, and Pechero recommended surgery, which is still pending.[9] Pechero stated that, the day before his deposition testimony, Castillo underwent another MRI which showed continuing herniation issues.

On cross-examination, Pechero conceded that he relied on Castillo's representations to him that he did not have back or neck pain prior to the accident. He agreed that, usually, patients who have lower back surgery are able to return to work and regain their normal functions.

Gilbert Meadows, an orthopedic surgeon, testified by video-recorded deposition on behalf of Unimex. He reviewed Castillo's records, which show that he had a "relatively large disc herniation at L5-S1" and a "small disc herniation at C5-6 in the neck." He agreed that, within reasonable medical probability, the herniations were caused by the December 17, 2015 crash. He also agreed that physical therapy, an epidural steroid injection, and surgery were appropriate treatments. Meadows stated Castillo's lumbar decompression

---

[8] The "release" allowing Castillo to return to work without restrictions does not appear in the record.

[9] Pechero stated that Dones agreed with this recommendation as well.

discectomy surgery typically results in "5 to 8 percent impairment" and the expected cervical fusion surgery would result in an additional "5 percent" impairment. He stated that, for each surgery, it would take six weeks for the soft tissue to heal and another six weeks for "scar and soft tissue maturation"; therefore, for each surgery, "three months out of work is reasonable" for a manual laborer such as Castillo.

Also appearing by video-recorded deposition, vocational rehabilitation counselor Donna Johnson stated she interviewed Castillo in March of 2017 and reviewed his medical records along with Pechero's deposition testimony. Johnson said that Castillo is still taking Tramadol, a prescription painkiller, for injuries he suffered in the accident. In her opinion, given the diagnosis and work restrictions set by Pechero, Castillo should not be working as a meter reader. Johnson stated that Castillo would only be able to work in a "sedentary" job, which would require lifting of no more than ten pounds, and she testified that "only 8 percent of all jobs" are classified as sedentary unskilled jobs.[10] She did not think that Castillo had any skills that were transferrable to a sedentary job. She further stated that wages are higher nationally and statewide than they are locally in the Mission area, so using national or state wages to determine Castillo's earning ability was "misleading."

Johnson testified that Castillo told her he went back to work as a meter reader because he "was gonna lose [his] job if [he] didn't go back" and he needed the money to support his family. On cross-examination, she clarified that she was not serving as Castilllo's vocational counselor because ethical rules forbid serving both in that capacity

---

[10] Johnson later said that the "8 percent" figure refers to all sedentary jobs nationwide, including skilled, semi-skilled, and unskilled.

and as an expert witness. Johnson also conceded that she did not ask Castillo how often he has to lift heavy objects in his job as meter reader; that Castillo had been a "supervisor" or "foreman" for a cable company prior to working for the City; that he can type and is well-spoken; and that he had attended some college.

Another rehabilitation counselor, Emma Vasquez, testified by video-recorded deposition for Unimex. Vasquez stated that she prepared a report regarding Castillo in October 2017, and after receiving additional records, prepared a second report in February 2018. She did not meet personally with Castillo, but she reviewed his deposition, and she found that he is "very articulate" and educated. She stated that Castillo was still working as a meter reader as of January 2018, and she saw no records indicating that "he may not be performing his job as is requested or required," so "[h]e can remain in that job." Vasquez further stated that there are other jobs in the Mission area that pay as much or more which Castillo would be qualified for and physically able to do, such as "an electronics production supervisor; an information clerk; a gate guard, for instance, in a . . . gated community; an . . . electronics inspector; a gas dispatcher; a radio intelligence operator; a production clerk; and an equipment repairer." Vasquez reviewed Johnson's report and, when asked to comment on it, stated she would "recommend that she have a transferability of skills analysis done, because she was able to speak to [Castillo] and look at . . . that issue there." She disagreed with Johnson's conclusions that Castillo's work limitations "severely restrict" his access to the labor market. Vasquez acknowledged on cross-examination that she assumed Castillo had certain skills based on the job descriptions of his prior positions.

Castillo testified that, while serving in United States Army, he qualified as an expert

marksman and was trained in radio communications repair. He served tours of duty in Iraq and Korea. When he returned, he worked as an installer for a Time Warner contractor. Eventually, he was given the title "supervisor" but he still was responsible for installations. As an employee of the City of Mission, he had to read 400 to 500 meters every day—this required repetitive bending and stooping, and occasionally lifting 40-pound metal meter boxes. Despite his doctor's recommendations, Castillo returned to the same job about thirty days after his surgery—as soon as his unpaid medical leave ended—because he "was already close to losing [his] job," had exhausted his sick days and vacation days, and "didn't want to lose that job." He said: "I was begging the doctor to let me go back to work." Castillo said physical therapy did not help, the "pain continues to grow," and he now takes up to four doses of painkilling medicine daily. He is no longer able to pick up his seven-year-old son due to the pain.

Richard Cortez, an accountant, testified that he calculated Castillo's past lost wages at $10,505, representing eight hours of work for 137.5 days of missed time, at Castillo's hourly wage. He included sick leave and vacation days in his calculations because Castillo was forced to use those days as a result of the accident. When asked whether he was able to calculate Castillo's future earning capacity, Cortez replied "yes and no." Because he did not know of Castillo's "vocational alternatives" when he made his report, Cortez assumed that Castillo "would not be able to work in any capacity. . . ." Taking into account income taxes and growth rate, Cortez determined in his report that Castillo would have earned $612,995 in future wages and benefits "up until [the time] he would stop working." He estimated Castillo's future work-life expectancy at 27.7 years, and he explained that some people work well beyond their work-life expectancy.

14

Cortez stated that Castillo earned $13.37 per hour when including retirement benefits, which is forty percent more than his nominal wage of $9.55 per hour. Cortez conceded that his initial report stated that Castillo earned only about twenty-five percent above his nominal salary in fringe benefits. He explained that, at the time of his initial report, he did not know about the retirement benefits. According to Cortez, including the retirement benefits, Castillo would have earned $660,505 for the remainder of his working life.

Eduardo Yzaguirre, a private investigator, testified that he was hired by Unimex's counsel to surveil Castillo and obtain footage of him "doing strenuous work as it affects his lower back." An eight-minute video recording of Castillo taken by Yzaguirre was entered into evidence and played for the jury. It shows Castillo coaching a youth baseball team and engaging in ordinary activities, such as walking, without any apparent severe pain. Yzaguirre did not know whether Castillo did anything on the video that would be against his doctor's instructions.

**D.    Charge, Verdict, and Judgment**

Following the close of evidence, the trial court granted Castillo's motion for a directed verdict that he was not at fault for the accident, and that Lara was in the course and scope of his employment with Unimex at the time of the crash. The trial court also granted appellants' motion for directed verdict on Castillo's gross negligence claim. Thus, the jury was not asked to assess exemplary damages.

The jury found that Lara's negligence proximately caused the crash and that Castillo would be fairly and reasonably compensated by the following damages: (1) $92,344.32 in past medical expenses; (2) $429,700 in future medical expenses; (3)

15

$10,505 in past loss of earning capacity; (4) $650,000 in future loss of earning capacity; (5) $100,000 for past physical impairment; (6) $700,000 in future physical impairment; (7) $250,000 in past physical pain and mental anguish; and (8) $625,000 in future physical pain and mental anguish. The trial court rendered judgment for the total amount of $2,857,539.32, plus pre- and post-judgment interest, and it denied appellants' motion for new trial. This appeal followed.

## II. DISCUSSION

### A. Jury Charge

After a jury trial, the trial court must submit a written charge including all "questions, instructions and definitions . . . which are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278. "A trial court may refuse to submit an issue only if no evidence exists to warrant its submission." *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). We review alleged charge error for abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or, in other words, when the act is arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

By their first issue, appellants argue that the trial court erred by refusing their request for a charge question asking if Castillo was negligent with respect to the December 17, 2015 accident. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (providing that the trier of fact "shall determine the percentage of responsibility" for "each claimant" and "each defendant," but not allowing "submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission"). They

16

direct us to Cavazos's testimony that he saw no skid marks from Castillo's vehicle, as well as his general statements that drivers need to be aware of all conditions on the roadway and should slow down if they see something up ahead. Appellants also argue that Castillo said he was driving in the middle lane, and that this contradicts Cavazos's testimony that Castillo was in the outer lane.[11] And, they point out that Castillo could not recall whether he applied his brakes prior to impact.[12]

We disagree that this constitutes evidence of Castillo's negligence. The evidence unanimously established that Lara was entirely at fault for the accident. Cavazos stated that Castillo did not commit any traffic violations leading up to the crash, and Lara conceded that Castillo was not responsible for it in any way. Although Lara was moving relatively slowly at the time of impact, all witnesses agreed that Castillo did not act improperly, even if he failed to apply the brakes, because the position of the tractor-trailer moving toward the left-most lane indicated that it was entering the highway. Cavazos calculated that Castillo would have had insufficient time—1.63 seconds—to react to Lara's sharp right turn. Further, given the fact that Lara's hazard lights rendered his turn signal imperceptible, there was no way for Castillo to anticipate that Lara would make the turn. We conclude there was no evidence to support a finding that Castillo's negligence, if any, contributed to the crash. Thus, the trial court did not err in denying a charge question in that regard. Appellants' first issue is overruled.

---

[11] In his trial testimony, Castillo first stated clearly that the Unimex tractor-trailer was in the middle lane. Later, in response to a question about whether he was driving "along the right side of that Unimex truck," Castillo stated: "That's correct. On the middle lane." Given his earlier unequivocal testimony, it is unclear whether Castillo meant *he* was driving in the middle lane or Lara was. Even if we were to construe this statement as appellants do, it would not tend to indicate Castillo was negligent.

[12] Castillo asks us to overrule the issue on grounds of inadequate briefing. *See* TEX. R. APP. P. 38.1(i). We will not do so because appellants' argument, though meritless, is supported by relevant authority and record references. *See id.*

By their fifth issue, appellants argue that the trial court erred in denying their request for the following instruction to accompany the damages questions:

> Do not include any amount for any condition resulting from the failure, if any, of Ray Castillo to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating his injuries, if any, that resulted from the occurrence in question.

Generally, if a plaintiff fails to mitigate his damages by treating his injury "as a reasonable prudent person would have done in the same or similar circumstances," the plaintiff cannot recover damages proximately resulting from that failure. *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 862 (Tex. 1999) (citing *Moulton v. Alamo Ambulance Serv., Inc.,* 414 S.W.2d 444, 447, 449 (Tex. 1967)); *Mondragon v. Austin*, 954 S.W.2d 191, 195 (Tex. App.—Austin 1997, writ denied) (noting a plaintiff may not recover damages that could have been avoided or minimized "at a trifling expense or with reasonable exertions"). Though mitigation is not an affirmative defense which must be pleaded in the defendant's answer, *Moulton*, 414 S.W.2d at 447, the burden of proof on the issue of failure to mitigate is on the defendant. *Kartsotis v. Bloch*, 503 S.W.3d 506, 522 (Tex. App.—Dallas 2016, pet. denied); *see Am. W. Airlines, Inc. v. Tope*, 935 S.W.2d 908, 915 (Tex. App.—El Paso 1996, no writ) (citing *Gulf Consol. Int'l, Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex. 1983) (op. on reh'g)).

In arguing that there was evidence to support the requested instruction, appellants note that Castillo returned to his job as a meter reader following the accident. They contend that, by doing so, Castillo violated the advice of Pechero, who initially recommended that he do no heavy lifting, no walking for extended periods of time, and no bending or stooping—all activities which Castillo's job required. However, as appellants recognize, Pechero later changed his advice and signed a "release" allowing

18

Castillo to return to work without any limitations. Appellants emphasize that Pechero signed the "release" only at the urging of Castillo, who wanted to return to work for financial reasons. But regardless of whether the revised recommendation was medically sound, and regardless of whether Pechero made the recommendation "[a]gainst [his] will," as he claims, the fact remains that Castillo's treating physician explicitly stated in writing that he could return to work without restrictions. It cannot be said that a reasonable person, in the same or similar circumstances as Castillo, would have declined to return to his job despite having his doctor's explicit written approval to do so. Thus, we cannot say that the trial court erred in denying appellants' requested instruction on Castillo's failure to mitigate damages. Appellants' fifth issue is overruled.

## B. Motion for Mistrial

By their second issue, appellants contend that the trial court erred by denying their motion for mistrial made after excerpts from Rodriguez's video deposition were played for the jury. The denial of a motion for mistrial is reviewed for abuse of discretion. *Till v. Thomas*, 10 S.W.3d 730, 734 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

The relevant excerpts, which were transcribed and admitted as an exhibit at trial,[13] show the following:

Q: . . . [A]t the time [Lara] got hired, wouldn't your job be to make a determination that he would be classified as an entry level driver or not or that thought never crossed your mind?

A: Sure.

. . . .

Q: And that would have been in violation of the two year minimum

---

[13] The actual video recording of Rodriguez's deposition does not appear in the record before this Court. The parties do not dispute that the transcription is accurate.

19

requirement that Unimex had, right?

A:    That's what we have now. So if our third party qualified him, then he was okay to drive.

Q:    Well, who's the third party?

. . . .

A.    —could be our insurance.

. . . .

Q:    —can we safely say that the Unimex policy of requiring a minimum of two years was not followed when [Lara] was hired? Can we agree to that?

A:    Yes.

(Gaps in original.) After portions of Rodriguez's deposition were played for the jury, including the above colloquy, appellants' counsel moved for mistrial on grounds that insurance was mentioned. Castillo's counsel stated that the reference to insurance was mistakenly included in the video excerpts. The trial court denied the motion for mistrial.[14]

"Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully." TEX. R. EVID. 411. "[W]here the plaintiff by artful questions attempts to convey to the jury the information that the defendant probably is protected by indemnity insurance, a mistrial should be declared." *Atchison, Topeka & Santa Fe Ry. Co. v. Acosta*, 435 S.W.2d 539, 549 (Tex. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.); *see Barrington v. Duncan*, 169 S.W.2d 462, 465 (Tex. 1943) (noting that "a jury is more apt to render a judgment against a defendant, and for a larger amount, if it knows that the defendant is protected by insurance"). But "[t]he mere mention of insurance is not necessarily grounds for reversal."

---

[14] Appellants' counsel did not ask the trial court for an instruction to disregard, and none was given.

*Babcock v. Nw. Mem'l Hosp.*, 767 S.W.2d 705, 708 (Tex. 1989); *Michaelski v. Wright*, 444 S.W.3d 83, 91 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In the absence of a clear showing by the complaining party that any reference to insurance resulted in any harm or prejudice, refusal to declare a mistrial is not error. *Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 193 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.); *see* TEX. R. APP. P. 44.1(a) (standard for reversible error in civil cases).

Appellants observe that, though the jury's award for "past incurred economic damages" was only $102,839.32, its total damages award was "almost 28 times" that, and it contends that "the only logical explanation" for the discrepancy is that "insurance was injected into the case." We disagree. The reference to insurance in Rodriguez's deposition testimony was fleeting and unspecific, and its inclusion in the video excerpts was accidental. Moreover, the reference was made during a discussion exclusively concerning whether Unimex complied with regulations in its hiring process, which was relevant only to Unimex's liability, not to the amount of damages Castillo incurred. Under these circumstances, we cannot say that appellants have shown they were harmed or prejudiced by the isolated reference to insurance. Therefore, the trial court did not err in denying appellants' motion for mistrial. *See Brownsville Pediatric Ass'n*, 68 S.W.3d at 193. We overrule appellants' second issue.

## C.      Disclosure of Expert Testimony

By their third and fourth issues, appellants argue it was error for the trial court to "allow or refuse to limit" the expert testimony of Cortez and Pechero, respectively. Appellants contend that Cortez "changed his report" and gave "new factual information not previously disclosed" by including Castillo's City of Mission retirement benefit in

calculating his future earnings at trial. They note that, in his report prepared prior to trial, Cortez did not include the retirement benefit in that calculation. As to Pechero, appellants complain of the doctor's testimony regarding (1) the likelihood that a patient undergoing lumbar discectomy surgery would need additional spinal fusion surgery, and (2) the likely cost of Castillo's pending cervical fusion surgery. Appellants note that these particular items of information were not disclosed in discovery, and they argue that they were unfairly surprised and prejudiced by their admission at trial.

In discovery, a party may request disclosure of a testifying expert's identity, the subject matter on which the expert will testify, a summary of the expert's mental impressions and opinions, and the data that the expert reviewed in anticipation of his testimony. TEX. R. CIV. P. 194.2(f). The purpose of this rule is to give the opposing party sufficient information about the expert's opinions to prepare to cross-examine the expert and to prepare expert rebuttal evidence. *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 348 (Tex. App.—Fort Worth 2003, pet. denied).

> If a party learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct, the party must amend or supplement the response:
>
> (1)     to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses, and
>
> (2)     to the extent that the written discovery sought other information, unless the additional or corrective information has been made known to the other parties in writing, on the record at a deposition, or through other discovery responses.

TEX. R. CIV. P. 193.5. A party's duty to amend and supplement written discovery regarding a testifying expert is governed by Rule 193.5. TEX. R. CIV. P. 195.6. That said, "[i]f an expert witness is retained by, employed by, or otherwise under the control of a party, that

22

party must also amend or supplement any deposition testimony or written report by the expert, but only with regard to the expert's mental impressions or opinions and the basis for them." *Id.*

> A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> (1)    there was good cause for the failure to timely make, amend, or supplement the discovery response; or
>
> (2)    the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6(a). The burden of establishing good cause or lack of unfair prejudice or surprise is on the party seeking to call the witness, and the trial court's finding of good cause or lack of prejudice or surprise must be supported by the record. TEX. R. CIV. P. 193.6(b). We review a trial court's evidentiary rulings for abuse of discretion. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014); *Miller*, 142 S.W.3d at 348.

Appellants argue that the trial court erred in denying their objections to the above-referenced testimony because Castillo "made no showing of good cause" and the trial court "made no finding of good cause" for Castillo's failure to supplement his discovery responses. *See* TEX. R. CIV. P. 193.6(a). In response, Castillo contends that he had no duty to supplement his responses because those responses were adequate.

In order for evidence to be excluded under Rule 193.6(a), a party must have failed to timely comply with a discovery obligation. *See id.* Castillo's third supplemental response to appellants' requests for disclosure designated Cortez as a retained economic expert and stated that he may testify as to, among other things, "future economic

23

damages" Castillo sustained as a result of the accident. The discovery response also stated that Cortez's "factual observations, mental impressions, conclusions, and opinions will be elaborated on at any deposition he gives in the case." Appellants emphasize that Cortez's trial testimony with respect to future lost earnings differed from his written report, but they do not suggest that Castillo ever "learn[ed]" that his discovery response "was incomplete or incorrect when made" or "is no longer complete and correct" so as to trigger an obligation to supplement under Rule 193.5. *See* TEX. R. CIV. P. 193.5. Instead, the discovery response accurately and adequately described the subject matter of Cortez's eventual trial testimony. *See Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993) ("Our rules do not prevent experts from refining calculations and perfecting reports through the time of trial."); *Kingsley Props., LP v. San Jacinto Title Servs. of Corpus Christi, LLC*, 501 S.W.3d 344, 353 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.). Moreover, although Cortez was a retained expert, Castillo also had no duty to supplement Cortez's deposition testimony under Rule 195.6 because Cortez's revised future economic damages estimate was based on newly-known facts (i.e., that Castillo had been earning a City of Mission retirement benefit), not updated "mental impressions or opinions" of the expert. *See* TEX. R. CIV. P. 195.6. Because Castillo was not required to supplement his discovery responses with respect to Cortez's expert testimony, the trial court did not err in overruling appellants' objection to it.

The analysis differs slightly with respect to Pechero. Castillo's discovery response designated Pechero as a "non-retained" medical expert and stated that Pechero may testify as to Castillo's "medical treatment, diagnosis, prognosis," as well as the cause of Castillo's injuries. The discovery response provided no reason for appellants to expect

24

that Pechero would testify as to the likely *cost* of Castillo's anticipated cervical disc surgery.[15] But Pechero did testify in that regard at his deposition. Thus, although Castillo's discovery response was inadequate, he was under no obligation to supplement it because "the additional or corrective information has been made known to the other parties . . . on the record at a deposition . . . ." TEX. R. CIV. P. 193.5(2). For the same reason, even if Castillo was required to supplement, the testimony would not be inadmissible because appellants were not unfairly surprised or unfairly prejudiced by its admission. *See* TEX. R. CIV. P. 193.6(a)(2). The trial court did not abuse its discretion in overruling appellants' objection to Pechero's testimony.

Appellants' third and fourth issues are overruled.

## D.    Damages

Appellants' remaining issues challenge the legal and factual sufficiency of the evidence at trial to support the various damages awards. Castillo argues that appellants failed to preserve their legal sufficiency arguments because they did not raise the issue below. We agree. Generally, to preserve a complaint for appellate review, a party must present to the trial court a timely and specific request, objection, or motion. TEX. R. APP. P. 33.1(a). In particular, to preserve a legal sufficiency challenge after a jury trial, a party must have specifically raised its complaint in: (1) a motion for instructed verdict; (2) an objection to the submission of a jury question; (3) a motion for judgment notwithstanding the verdict; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *Gerdes v.*

---

[15] Castillo's discovery response also stated: "Please see [Castillo]'s produced medical records for the general substance of [Pechero's] testimony." But in his brief on appeal, Castillo does not point to any particular part of the voluminous medical records suggesting that Pechero might testify as to the cost of Castillo's cervical disc surgery.

*Kennamer*, 155 S.W.3d 523, 531–32 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied). Appellants argue on appeal that their issue was preserved in their motion for new trial.[16] However, their motion for new trial challenged only the factual sufficiency of the evidence supporting the damages awards, not the legal sufficiency.[17] Accordingly, the legal sufficiency points have not been preserved, and we will proceed to review the factual sufficiency points.

In reviewing factual sufficiency of the evidence supporting a damages award, we consider all the evidence in a neutral light and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The jury has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002).

### 1.  Future Medical Expenses

Appellants' sixth issue concerns the jury's award of $429,700 in future medical expenses. They contend that Pechero's testimony—the only expert testimony offered on the issue of future medical expenses—did not demonstrate that additional fusion surgery on Castillo's lumbar spine would be reasonably necessary in the future.[18] They note that,

---

[16] At the close of Castillo's case-in-chief, appellants moved for directed verdict on gross negligence, future loss of earning capacity, past medical expenses, and future expenses. However, they did not renew their motion after presenting their own case-in-chief. Accordingly, the motion for directed verdict does not preserve their legal sufficiency complaints. *See 1986 Dodge 150 Pickup VIN No. 1B7FD14T1GS006316 v. State*, 129 S.W.3d 180, 183 (Tex. App.—Texarkana 2004, no pet.) ("If a party proceeds to present evidence after that party has moved for a directed verdict, such party must reurge the motion for directed verdict at the close of the case, or any error in its denial is waived.").

[17] Specifically, with respect to each of the jury charge questions, appellants' motion for new trial stated: "Defendants complain of factual insufficiency of evidence to support the jury's finding, that the jury finding was against the overwhelming weight of the evidence, the excessiveness of the damages found by the jury, and that incurable jury argument led to an erroneous jury finding."

[18] Appellants do not dispute that the evidence was factually sufficient to establish the likely *cost* of

26

when Pechero was asked whether Castillo's "chances of having a second surgery . . . would be very low" if Castillo followed his advice regarding work restrictions, Pechero stated: "Much less than if he continues doing the work that he [is] doing at this time." When asked whether it is likely that Castillo would need "additional surgery" "if he continues to do this type of work for 5, 10, . . . 15 years," Pechero replied: "It's a probability you may consider."

Pechero explained that "if [Castillo] has recurrent disc herniation, or he has collapse of the space, or instability of the lower back," then he might need spinal fusion surgery. According to Pechero, one option for this type of surgery is "360-degree fusion," which actually comprises two surgeries—one made with an anterior incision to remove the disc and another made with a posterior incision to fuse the vertebrae. Pechero opined that spinal fusion is a "very expensive" operation—including tens of thousands of dollars in fees to the hospital, the anesthesiologist, and multiple surgeons—and that the "360-degree" technique would "duplicate the expense."[19] When asked whether it would be

_____

each additional surgery.

[19] Pechero's specific testimony as to the cost of anterior spinal fusion surgery was as follows:

Q.      . . . Do you have experience in —in the cost of surgeries?

A.      Yeah. The hospital probably charge—I don't know how much charge in this case. But with something very similar—I don't have it—but, usually, it's no surprise to charge 70, $75,000—the hospital.

Q.      Okay.

A.      Anesthesia, with general—$3,000. The instrumentation is about—probably 8—8, $9,000. Then you have the EMG, intraoperative. You have the—

Q.      And how much is that?

A.      I think they charge $9,000.

Q.      Oh.

A.      And then they have the surgeon, which are maybe 10, 15, $20,000—depend how long the operation. They have the—also a vascular surgeon. They need to open the abdomen for you. Because you go into the abdomen, and all—pushing all the

"reasonable to expect this type of surgery . . . if [Castillo] continues to lift this type of equipment," Pechero stated: "It's a possibility." In response, Castillo notes that "it is undisputed that Castillo will need surgery on a disc in his neck, and [Pechero] provided details into how that surgery is completed, as well as its likely reasonable costs." Castillo argues the evidence was sufficient because the jury "had specific information concerning Castillo's injuries, the medical care he received before trial, his condition at the time of trial, his need for future medical treatment, and the specific reasonable costs for the procedures."

> [I]n order to recover future medical expenses, a plaintiff is required to show there is a reasonable probability that medical expenses resulting from the injury will be incurred in the future and then show the reasonable costs of such care. It is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses. Because no precise evidence is required, the jury may award such damages based on the nature of the injury, the medical care rendered before trial, and the condition of the injured party at the time of trial.

*Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 121 (Tex. App.—Texarkana 2006, pet. denied) (internal citations omitted). Here, the total cost of one spinal fusion surgery, according to Pechero, would be between $130,000 and $146,000.[20] The jury's award of nearly triple the maximum amount for one surgery indicates that it believed Castillo would,

---

way out, and going through the spine. You will find—You will see the spine, like this. Like this, you will see the spine. Through the abdomen, you will find disc, and remove the disc complete. And then you have the assistant fee—need another surgeon to assist him.

Q.     And, more or less, how much would that be?

A.     Would not surprise—40, $50,000.

Q.     Okay. And your—And then, there would be your fees; correct?

A.     That one is included in the fee, probably.

Q.     Oh. Okay. So 40 or 50 would be included for you and for the assistant?

A.     Probably. Yes.

[20] *See supra* note 19.

in reasonable probability, incur expenses for three such surgeries; i.e., the cervical fusion and the two-part lumbar fusion.

But although it was undisputed that Castillo will incur expenses for fusion surgery on his cervical spine, Pechero's testimony concerning the likelihood of additional *lumbar spine* surgery was contingent on Castillo "continu[ing] to do this type of work for 5, 10, . . . 15 years . . . ." That is, Pechero's testimony established that Castillo would need "360-degree" fusion surgery on his lower back *only if* he continued to work as a meter reader for the City of Mission for many years to come.

The jury could not have reasonably concluded that there was a reasonable probability of this happening. Evidence showed that Castillo wanted to return to work prematurely, despite the physical restrictions placed upon him by his doctor, because his family was in financial difficulty and he thought he would lose his job if he did not return. But having already awarded Castillo compensation for his future lost earning capacity, the jury could not have reasonably inferred that Castillo intended to return to his position as meter reader.[21] We conclude the jury's award of future medical expenses for two lumbar spine surgeries is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Instead, the evidence supported, at most, an award of $146,000 in future medical expenses, representing the likely cost of Castillo's anticipated cervical spine surgery. Appellants' sixth issue is

---

[21] Appellants do not argue on appeal that the awards for future medical expenses and future loss of earning capacity present a conflict or constitute an impermissible double recovery. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) (per curiam) (noting that a "double recovery exists when a plaintiff obtains more than one recovery for the same injury"); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 773 (Tex. 2003) ("[I]n reviewing a challenge that an award for a [damages] category is excessive because there is factually insufficient evidence to support it, a court of appeals should consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages.").

sustained.

## 2. Future Loss of Earning Capacity

Next, appellants' seventh issue disputes the sufficiency of the evidence supporting

the award of $650,000 in damages for future loss of earning capacity.

> Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after the trial. Because the amount of money a plaintiff might earn in the future is always uncertain, the jury has considerable discretion in determining the amount.
>
> To support an award of damages for loss of future earning capacity, the plaintiff must introduce evidence sufficient to allow the jury to reasonably measure earning capacity in monetary terms. The plaintiff does not have to show actual earnings, life expectancy, or even the plaintiff's employment at the time of the injury. An award of damages for loss of future earning capacity can be based on a composite of factors that may affect a person's capacity to earn a living. To support an award of damages for loss of future earning capacity, the plaintiff can introduce evidence of past earnings; the plaintiff's stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. There must be some evidence that the plaintiff had the capacity to work prior to the injury, and that his capacity was impaired as a result of the injury.

*Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35–36 (Tex. App.—Tyler 2003, pet.

denied) (internal citations omitted). Appellants contend that the evidence was insufficient

because "no medical doctor testified [Castillo] was unable to work" and "the only medical

evidence at trial was that [Castillo] had a successful surgery and was still working."

Trial evidence established that, at the time of the accident, Castillo was earning

$13.37 per hour with the City of Mission, including his City retirement benefit. Cortez

testified that Castillo's future work-life expectancy was 27.7 years, and therefore, the total

amount Castillo would have been able to earn during that time was $660,505. The jury's

award approximated that amount, thereby suggesting it believed Castillo's loss of earning

capacity was total and complete—i.e., it did not believe Castillo would be able to work at

all for the rest of his work-life expectancy. This determination was not contrary to the overwhelming weight of the evidence. Cortez stated he initially assumed Castillo would "not be able to work in any capacity" because he was unaware of any "vocational alternatives." But Johnson's testimony provided a factual basis for that underlying assumption. She opined that Castillo would be employable only in a "sedentary" position, and she stated that "only 8 percent of all jobs" nationwide are classified as "sedentary." Moreover, Johnson stated she did not believe Castillo's skills were transferrable to any sedentary job. Although Vasquez disagreed with that opinion, we must defer to the jury's resolution of conflicts in the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (noting that "in conducting a factual sufficiency review, a court must not merely substitute its judgment for that of the jury" and that "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony").

We find the evidence was factually sufficient to support the award of damages for future loss of earning capacity. Appellants' seventh issue is overruled.

### 3. Non-Economic Damages

By their eighth issue, appellants argue the evidence was insufficient to support the awards of $250,000 for past physical pain and mental anguish and $625,000 for future physical pain and mental anguish. They argue by their ninth issue that the evidence was insufficient to support the award of $100,000 in damages for past physical impairment and $700,000 in damages for future physical impairment. And by their tenth issue, appellants argue that the trial court erred in denying their motion for new trial because the damages awards for pain and anguish and physical impairment were excessive.

These issues each address the factual sufficiency of the evidence supporting the

award of non-economic damages. *See Thompson v. Stolar*, 458 S.W.3d 46, 61 (Tex. App.—El Paso 2014, no pet.) ("Texas recognizes the following categories of non-economic damages: pain, suffering, mental anguish, disfigurement, and physical impairment.") (citing *Golden Eagle Archery*, 116 S.W.3d at 769); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) (noting that a complaint regarding excessive damages is equivalent to a challenge to the factual sufficiency of the evidence supporting the damages awards). These categories of non-economic damages may overlap. *Thompson*, 458 S.W.3d at 61 (citing *Golden Eagle Archery*, 116 S.W.3d at 770). In *Golden Eagle Archery*, the Texas Supreme Court explained how appellate courts should evaluate factual sufficiency challenges in cases, like this one, where the jury is permitted to award non-economic damages in several different categories, some of which may overlap, and is also instructed not to award damages for the same element more than once. *See* 116 S.W.3d at 771. The Court stated:

> [I]n reviewing a challenge that an award for a category is excessive because there is factually insufficient evidence to support it, a court of appeals should consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages. To do otherwise would mean that evidence that reasonably could have supported the jury's award would not be considered, which would be improper. *If more than one award in overlapping categories is challenged as excessive, the court of appeals should consider all the evidence that relates to the total amount awarded in all overlapping categories to determine if the total amount awarded was excessive.*

*Golden Eagle Archery, Inc.*, 116 S.W.3d at 773–74 (emphasis added). We therefore consider appellants' eighth, ninth, and tenth issues together.

Here, the jury was instructed that "Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." However, the other damages elements were not defined in the jury charge.

An award for mental anguish must be supported by either (1) a substantial disruption in the plaintiff's daily routine, or (2) evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. There must be evidence of the existence of compensable mental anguish damages and evidence to justify the amount awarded.

Non-economic damages, such as mental anguish damages, cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment. Given the impossibility of any exact evaluation of mental anguish, juries must be given a measure of discretion in finding damages, though that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. The amount awarded must be fair and reasonable compensation, given the evidence presented.

*Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017) (internal citations and quotations omitted).

Physical impairment, which is sometimes called loss of enjoyment of life, encompasses the loss of the injured plaintiff's former lifestyle. To receive damages for physical impairment, the injured party must prove that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated. A plaintiff must produce some evidence showing the tasks or activities she is unable to perform, unless the separate and distinct loss is obvious. However, a plaintiff need not prove an inability to perform an act that she was previously able to perform. Nor must a plaintiff prove egregious injuries to recover physical-impairment damages.

*Telesis/Parkwood Retirement I, Ltd. v. Anderson*, 462 S.W.3d 212, 242 (Tex. App.—El Paso 2015, no pet.) (internal citations and quotations omitted); *see Golden Eagle Archery, Inc.*, 116 S.W.3d at 772 (noting that "the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity").

Appellants argue that, according to the medical testimony, Castillo's lumbar discectomy surgery was successful, and it resulted in at least a partial reduction in pain.

They also note that, in his closing argument, Castillo's counsel argued for the award of mental anguish damages by suggesting that Castillo's intimate relationship with his wife was detrimentally affected by his injuries. Appellants argue that, to the extent the pain and anguish awards were based on this suggestion, the evidence was lacking.

The evidence unanimously established that Castillo was in a serious accident which necessitated physical therapy, epidural steroid injections, and at least two surgeries. At the time of trial, Castillo was still taking several doses of painkilling medication daily. Castillo's friends and co-workers testified that, since the accident, Castillo appears to be in pain and is limited in his activities. Castillo himself testified that his "pain continues to grow" and he is now unable to pick up his youngest son. He testified that his son "runs over to me, but my wife has to stop him from, you know, trying to jump on me. And I can't lift him up to just congratulate him. So that's—that's hurtful."

Appellants are correct that Castillo's trial testimony regarding his intimate relationship with his wife was ambiguous, at best. His testimony in this regard was as follows, in its entirety:

| Q. [Castillo's counsel] | I want to talk to you about one last thing. And I know that you've had great reservations about talking publicly about this, because it's a very personal matter. And, I'm sorry, I need to ask. |
|---|---|
| | As a result of your lower back injury and as a result of surgery as well, have you had any change in the relationship—intimate relationship—that you have had with your wife? |
| A. [Castillo] | I mean, just—Yes. I can't—We're—Me and my wife are very affectionate people. |
| Q. | And when you compare your affection and your intimate relationship before this crash, and now, as it is—has been for these, you know—time period thereafter—Has it been a very significant change? |

34

A. It has been changed.

Castillo did not explicitly state that his relationship with his wife has been *negatively* affected by the injury. Even assuming that, by saying "[i]t has been changed," Castillo meant it has been changed for the worse, it is noteworthy that Castillo declined to simply agree with his counsel that the change was "very significant."

However, contrary to appellants' argument, this was not the only evidence concerning the effect the injury had on Castillo's marital relations. In particular, the following colloquy occurred during Pechero's testimony:

Q. [Castillo's counsel] Ray had testified under oath, through his deposition, and he had stated that—that this crash with Unimex has affected his intimacy with his wife.

And, in fact, it—mentions some issues with inability to have sex with his wife. My question to you is this: Is there anything about any of the injuries that Ray Castillo had that would cause him to have a problem having a sexual relationship with his wife?

A. [Pechero] Yeah. The nerves then going to the lower extremities have branched, and go into the bladder, and go into the rectum. This is the reason that one of the complications—before you operate this patient—wait too long. I don't say specifically on this patient. But could be loss of the sphincters, which control the bladder and control the—the BM. This is no surprise. This is not the first time a patient told me he had difficulties on erections.

Q. Okay. And so this is a problem that you have seen before, as an injury to the L5-S1, that Ray Castillo has?

A. Not only L5-S1. I saw also L4-L5.

Q. Him claiming to you that he has this problem would be consistent with what you know about these types of injuries?

A. Yeah. That problem.

35

The jury could have found from all of this evidence that Castillo suffered pain, anguish, and impairment in the past and that it is reasonably probable he would suffer pain, anguish, and impairment in the future. That being so, the jury must be afforded "a measure of discretion" in finding the exact amount of non-economic damages. *See id.* We have reviewed the entire trial record and the cases cited by the parties, and we find the jury did not abuse that discretion in this case. *See PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 518 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (affirming awards of $150,000 for past pain and anguish and $520,000 for future pain and anguish where plaintiff had "terrible headaches and ringing in his ears for over two and one-half years, severe pain in his right eye upon exposure to light, and soreness and stiffness in his neck and shoulder"); *Casas v. Paradez*, 267 S.W.3d 170, 178 (Tex. App.—San Antonio 2008, pet. denied) (affirming award of $3 million for pain and anguish where decedent suffered a "terrible beating," decedent's daughter did not recognize him in the emergency room, and medical records indicated decedent "received little pain medication because it was medically necessary not to over-medicate him while the doctors and nurses monitored his concussion"); *Dawson v. Briggs*, 107 S.W.3d 739, 751 (Tex. App.—Fort Worth 2003, no pet.) (affirming awards of $50,000 for past pain and anguish and $25,000 for future pain and anguish where plaintiff testified to past and continuing neck and back pain, three months of physical therapy, pain in her ear and jaw, and the pain in her chest); *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 81 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied) (finding that award of $500,000 for pain, anguish, and disfigurement was not against the great weight and preponderance of the evidence where plaintiff suffered "obvious pain and permanent disfigurement" from the loss of her two front teeth); *see also*

36

*Smith v. Carter*, No. 13-11-00639-CV, 2012 WL 3252499, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 9, 2012, pet. denied) (mem. op.) (affirming award of $18,500 for past pain and anguish and $6,000 for future pain and anguish where plaintiff "continues to suffer from neck and lower back pain, sudden headaches, depression, and anxiety" and "testified that she will likely undergo surgery to remove the glass fragments from her forehead"); *Wal-Mart Stores, Inc. v. Ortiz*, No. 13-98-518-CV, 2000 WL 35729388, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 3, 2000, pet. denied) (mem. op.) (affirming awards of $10,000 for past pain and anguish and $3,750 for future pain and anguish where plaintiff continues to have knee pain and "testified she is unable to do things which she could before, such as bending her knee, walking a lot, and kneeling").[22]

The mere fact of a large award does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence. *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 228 (Tex. App.—Amarillo 2003, no pet.). Instead, the evidence will be held factually insufficient only when the award is "flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience." *Id.*; *Transit Mgmt. Co. v. Sanchez*, 886 S.W.2d 823, 826 (Tex. App.—San Antonio 1994, no writ). Here, given the evidence, the award of $1,675,000 for non-economic damages was not so against the overwhelming weight of the evidence as to be clearly wrong or unjust, nor does it shock the conscience of the Court. *See Cain*, 709 S.W.2d at 176. We overrule appellants' eighth, ninth, and tenth issues.

---

[22] We note that the jury was instructed in the charge not to "compensate twice for the same loss, if any," and we presume the jury followed the court's instructions unless the record shows otherwise. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) (citing *Golden Eagle Archery, Inc.*, 116 S.W.3d at 771). Appellants direct us to nothing in the record suggesting that the jury disobeyed this instruction.

### III. Conclusion

There is factually insufficient evidence to support the damages award of $283,700 for future lumbar surgery medical expenses. We therefore reverse the portion of the trial court's judgment awarding those damages, and we remand for a new trial as to both liability and damages. *See* TEX. R. APP. P. 44.1(b)(2) (providing that we "may not order a separate trial solely on unliquidated damages if liability is contested"). Should Castillo, within fifteen days of our judgment, voluntarily remit the $283,700 for which the evidence was factually insufficient, then the error will be cured and we will supplement this opinion to affirm the trial court's judgment as modified, in accordance with the remittitur, thereby rendering a new trial unnecessary. *See* TEX. R. APP. P. 46.5; *Peshak v. Greer*, 13 S.W.3d 421, 428 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.).

The remainder of the trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed the
9th day of April, 2020.